SETON HALL LAW SCHOOL
CENTER FOR SOCIAL JUSTICE
Linda E. Fisher, Esq. (LF5646)
Mark Linscott, L. Civ. R. 101.1(h)
Kristen Coletta, L. Civ. R. 101.1(h)
833 McCarter Highway
Newark, NJ 07102
Phone (973) 642-8700
Fax (973) 642-5939
Linda.fisher@shu.edu
Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **FAIR HOUSING COUNCIL OF NORTHERN NEW JERSEY, GORDON DREWERY, NIYAH ATWELL, MICHAEL OTUWURUNNE,** | **CIVIL ACTION NO. _____** |
| *Plaintiffs*, | |
| **v.** | **VERIFIED COMPLAINT** |
| **TROY TOWERS INC.; AYSON REALTY CORP.,** | |
| *Defendants*. | |

The Plaintiffs the Fair Housing Council of Northern New Jersey ("the Fair Housing Council"), Gordon Drewery, Niyah Atwell and Michael Otuwurunne (collectively "Plaintiffs") through their attorney, file this Complaint against Troy Towers Apartments ("Troy Towers") and Ayson Realty ("Ayson") (collectively "Defendants"), and in support thereof allege as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 12 U.S.C. § 2614 and 28 U.S.C. § 1331 as this action arises under the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq*.  This action seeks to enforce 42 U.S.C. § 3604.

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because (i) a substantial part of the events or omissions giving rise to the claims occurred in this District; and (ii) Defendant has capacity to be sued in this District and therefore is deemed to reside in this District.

## PARTIES

### Plaintiff Fair Housing Council of Northern New Jersey

3. Plaintiff, the Fair Housing Council of Northern New Jersey, is a private, nonprofit civil rights organization in North New Jersey that enforces federal and New Jersey housing anti-discrimination laws.

4. The Fair Housing Council protects people who experience discrimination by investigating housing discrimination complaints; and if necessary, working with government agencies and private attorneys to bring actions for housing discrimination to ensure that fair housing laws are vigorously enforced.

5. In *Havens Realty Corp. v. Coleman*, the Supreme Court of the United States held that a fair housing organization has suffered an injury in fact, and therefore has standing to sue, when the defendant's discriminatory practices have impaired the organization's ability to carry out its purpose to ensure equal housing, thus resulting in a drain on the organization's resources. 455 U.S. 366, 379 (1982).

**Plaintiff Testers**

6.  Testers, including Plaintiffs Gordon Drewery, Niyah Atwell and Michael Otuwurunne, were hired by the Fair Housing Council to go to Troy Towers and meet with building staff about renting an apartment in an effort to ascertain whether discrimination was occurring and to collect evidence of housing discrimination on the basis of race.

7.  In *Havens Realty Corp. v. Coleman*, the Supreme Court also confirmed that testers have standing to sue under the Fair Housing Act because they are the object of misrepresentation made unlawful by the Act and suffer an injury that the Act was designed to prevent. 455 U.S. at 374-75.

**Defendant Troy Towers**

8.  The Defendant, Troy Towers Apartments, is an apartment development, located at 40 Conger Street, Bloomfield, N.J. 07003.

9.  Troy Towers apartments are dwellings within the meaning of 42 U.S.C. § 3602(b).

**Defendant Ayson Realty**

10. Ayson Realty is a property management company that owns Troy Towers and employs the staff on the property.

11. Ayson is located at 40 Conger Street, #108A, Bloomfield, N.J. 07003.

**FACTUAL ALLEGATIONS**

12. In July of 2017, the Fair Housing Council of Northern New Jersey received an e-mail alleging that the general manager of Troy Towers, Frank Stitt ("Mr. Stitt"), regularly engages in housing discrimination on the basis of race. The e-mail stated that Mr. Stitt consistently denies African Americans the opportunity to live at Troy Towers, even if their income is sufficient, because he says that he "hates everything about them." [Ex. A].

3

13. Mr. Stitt is the general manager at Troy Towers and upon information and belief, is responsible for having the final say over whether a prospective tenant's rental application is approved.

14. The e-mail also alleged that Mr. Stitt requires security guards in the guardhouse to warn him what race a prospective tenant is when the individual arrives on the property. When a prospective tenant comes to the guardhouse to check in before an apartment visit, the guard calls the leasing office to let the agents know that someone is there for an appointment. If Mr. Stitt trusts the guard who calls, he calls the guardhouse back to ask if the prospective tenant is an "animal," referring to someone of color. [Ex. A].

15. Upon information and belief Mr. Stitt told the security guards to inform any African American who approached the guardhouse and inquired about apartment availability that Troy Towers was currently at capacity; Mr. Stitt told the security guards, however, that if an African American looked like they were affluent, the guards could give them the rental office contact information.

16. Based on these allegations, the Fair Housing Council began investigating possible housing discrimination on the basis of race at the Troy Towers property ("Troy Towers" or "the test site").

17. The Fair Housing Council hired testers to act as prospective tenants at the test site. Using testers to expose housing discrimination is a common practice under the Fair Housing Act. According to the United States Department of Justice website, "[t]esting refers to the use of individuals who, without any bona fide intent to rent . . . [an] apartment . . . pose as prospective . . . renters of real estate for the purpose of gathering information."

18. Tests are often set up such that the testers have similar financial profiles and rental preferences, but differ only as to the protected trait, in this case, race.

19. After posing as prospective renters, the testers document their experience at the particular test site. Then, fair housing organizations and their lawyers compare the way the testers were treated at the test site in order to expose Fair Housing Act violations.

20. In this case, testers called or e-mailed the building staff at Troy Towers to set up an appointment to tour apartments at the test site and then went to those appointments. After their appointment, each tester filled out a form provided by the Fair Housing Council summarizing their experience at the test site.

21. As the facts will illustrate in more detail below, African American testers were consistently treated worse than Caucasian testers. They were shown already taken apartments, different apartments than white testers–even when the tests occurred on the same day–or the building staff was evasive about availability of apartments.

22. Upon information and belief, there were approximately 40 units available for rent at Troy Towers during the time period the Fair Housing Council sent testers to investigate allegations of discrimination.

23. All testers mentioned in this Complaint were African American or Caucasian, and indicated to the building staff that they were married with no children.

24. Upon information and belief, Mr. Stitt sometimes shows apartments to prospective tenants, but it is usually the job of Anna Lustica ("Ms. Lustica") to show apartments.

25. Ms. Lustica is an employee at Troy Towers, who works under the supervision of Mr. Stitt.

### July 24, 2017 Site Test

26. Plaintiff Gordon Drewery arrived at the test site at 11:00 A.M. on July 24, 2017 and met with Ms. Lustica to tour apartments. Mr. Drewery is an African American male who posed as married and indicated that he and his wife had a combined annual income of $168,000.

27. As the e-mail the Fair Housing Council received indicated would happen, Mr. Drewery stopped at the guardhouse before heading over to the leasing office.

28. Mr. Drewery told Ms. Lustica that he wanted to look at one-bedroom apartments for a tentative move in date of August 1, 2017.

29. At his appointment, Ms. Lustica told Mr. Drewery that there was an apartment available for August 1, but she could not show it to him that day.  She showed him #1005 and #306A instead, but indicated that these apartments were already taken.

30. John Moloughney arrived at the test site not long after Mr. Drewery, at 11:50 A.M. on July 24, 2017. Mr. Moloughney is a Caucasian male, posed as married, indicated a combined annual income of $152,000, and requested to see a one-bedroom apartment.

31. Mr. Moloughney also stopped at the guardhouse before heading over to the leasing office.

32. Ms. Lustica showed Mr. Moloughney units #805 and #1208, which were two completely different units than the ones she showed to Mr. Drewery.  The units were vacant and in the process of being cleaned and painted, and she told Mr. Moloughney that they would be available September 1.

33. Mr. Drewery and Mr. Moloughney were shown apartments on the same day, and despite having similar incomes, marital status, and both wanting a one-bedroom apartment, Mr. Drewery was shown taken apartments, while Mr. Moloughney was shown vacant and available apartments.

34. Ms. Lustica indicated to Mr. Moloughney that the apartments shown on July 24, 2017 would still be available more than an entire month in the future; Ms. Lustica made no such indication to Mr. Drewery, and only showed him apartments that had already been taken.

35. Mr. Moloughney called Ms. Lustica back on July 27, 2017 to see if the two units he saw – #805 and #1208 – were still available and she told him that they were. Mr. Drewery called Ms. Lustica back on July 28, 2017, and Ms. Lustica told him that #1005 was still unavailable, but she had a similar one on the 10th floor. Ms. Lustica did not give Mr. Drewery any information about available units #805 or #1208 – the units that she told Mr. Moloughney were still available. Ms Lustica also did not indicate to Mr. Drewery that there were units that would be available until September 1st as she previously indicated to Mr. Moloughney.

### July 31, 2017 Site Test

36. Mary Martin and Ralph Menendez are Caucasian, posed as a married couple, and visited the test site at 2:00 P.M. on July 31, 2017. The couple indicated a combined annual income of $102,000. The couple came to the test site together.

37. The couple stopped at the guardhouse before heading over to the leasing office.

38. The couple met with Mr. Stitt, the building manager, for their appointment and indicated that they wanted to look at one-bedroom apartments for a tentative move in date of August 1, 2017.

39. Mr. Stitt showed them units #101 and #1305, and told them that these units were vacant and would be available on August 1 and August 15, respectively.

40. While both Plaintiff Mr. Drewery (an African American Tester) and Ms. Martin and Mr. Menendez (both Caucasian Testers) gave the same move-in date of August 1 and all requested one-bedrooms, Mr. Drewery was not shown either of these vacant apartments. Instead, he

was shown taken apartments and told that there were no vacant apartments he could see at that time.  These tests were conducted only one week apart.

41. Plaintiff Niyah Atwell is an African American female, who posed as married, and indicated a combined annual income of $172,000.  She arrived at the test site shortly after Testers Ms. Martin and Mr. Menendez, on July 31, 2017 at 3:00 P.M., and stopped at the guardhouse before heading over to the leasing office.

42. Ms. Atwell met with Mr. Stitt and requested that he show her available one-bedroom apartments for a tentative move-in date of August 15, 2017.

43. During the duration of Ms. Atwell's visit, she asked Mr. Stitt for his name multiple times and he refused to tell her.

44. Mr. Stitt also informed Ms. Atwell that Troy Towers rented apartments on a first come first served basis and stressed this many times. He told her that a potential tenant should remit the required security deposit and credit check at the earliest possible opportunity, or risk losing an available apartment to a more motivated potential tenant. Mr. Stitt did not communicate this information to any Caucasian Testers who visited Troy Towers on July 31.

45. Nicole Pantiliano is a Caucasian female who posed as married, and visited the test site at 3:40 P.M. She indicated a combined annual income of $152,000.  She stopped at the guardhouse before heading over to the leasing office to meet with Mr. Stitt, and indicated that she wanted to see one-bedroom apartments for a tentative move in date of August 15, 2017.

46. Ms. Pantiliano arrived at the leasing office as Ms. Atwell was finishing up her meeting with Mr. Stitt.  Ms. Pantiliano overheard Mr. Stitt and Ms. Atwell's conversation.  Mr. Stitt seemed to be rushing Ms. Atwell out and telling her "whatever she wanted to hear" to get her to leave.

8

47. Mr. Stitt showed Ms. Pantiliano units #101 and #1305 and told her both would definitely be available for August 15, 2017.  Units #101 and #1305 were the same vacant units that were shown to Caucasian testers Ms. Martin and Mr. Menendez, but were withheld from African American tester Mr. Drewery one week previously.

### August 3, 2017 Site Test

48. Sonia Tross is an African American female who posed as married, and indicated a combined annual income of $168,000.  She arrived at the test site at 10:33 A.M. on August 3, 2017, stopped at the guardhouse before heading over to the leasing office, and met with Ms. Lustica.

49. Ms. Tross requested to see one-bedroom apartments for a tentative move in date of September 1, 2017.

50. Ms. Tross was shown a tenth floor apartment that had already been rented and was told that there were no available apartments.

51. Jayne Ace-Bosgra is a Caucasian female who posed as married, and indicated a combined annual income of $102,000.  She arrived at the test site shortly after Ms. Tross, at 11:50 A.M. on August 3, 2017.  She stopped at the guardhouse before heading over to the leasing office and met with Ms. Lustica for her tour. She told Ms. Lustica that she was looking to move in sometime in August or towards the end of the month.

52. Ms. Lustica showed Ms. Ace-Bosgra a taken tenth floor apartment, presumably the same apartment she showed Ms. Tross.  Ms. Lustica then brought Ms. Ace-Bosgra to a vacant and currently available first floor apartment. The door was locked, but Ms. Lustica opened it and let her see the apartment.

53. The blatant discrepancy between Ms. Tross's visit and Ms. Ace-Bosgra's visit is readily apparent: Ms. Lustica told African American Ms. Tross that there were no vacant apartments,

but just over an hour later, she showed Caucasian tester Ms. Ace-Bosgra a vacant and currently available apartment.

54. Plaintiff Ms. Atwell then returned to the test site with another African American tester, Plaintiff Michael Otuwurunne; Ms. Atwell and Mr. Otuwurunne posed as a married couple and indicated a combined annual income of $172,000.  The couple came to the test site together and arrived at 2:30 P.M. on August 3, 2017.  They stopped at the guardhouse before heading over to the leasing office.

55. Ms. Atwell previously visited the test site and met with Mr. Stitt during a July 31, 2017 test discussed above.  She was now bringing her husband to see apartments.

56.  On August 2, 2017, the day before this site visit, Ms. Atwell called Ms. Lustica to tell her that she already came for a visit, but wanted to come in with her husband.  Ms. Lustica told her that Mr. Stitt did not mention Ms. Atwell's previous visit, but said that there were three one-bedroom apartments available for an August 15 move-in date that she could show her when they came in the next day.

57. However, when Plaintiffs Atwell and Otuwurunne went to Troy Towers the next day, Ms. Lustica told them that nothing would be available by August 15. She instead showed them a previously-rented tenth floor apartment, presumably the same apartment she showed Ms. Ace-Bosgra and Ms. Tross.

58. The discrepancy here is clear: just one day prior to the site visit, Ms. Lustica told Plaintiff Atwell over the phone that there were three apartments available; but the next day, when she met the couple in person and saw their skin color, suddenly everything was taken.

59. Ms. Lustica then brought Ms. Atwell and Mr. Otuwurunne to the same first floor apartment that she showed Caucasian Tester Ms. Ace-Bosgra.  However, this time, instead of unlocking

the door like Ms. Lustica did for Ms. Ace-Bosgra, she told the couple that the door was probably locked because they had just redone the floors. For that reason, she told them she could not show them that apartment.

60. Ms. Atwell also noted that during her first visit, she saw the first floor apartment and remembered the floors being clean and finished already.

61. Mr. Stitt's statements to employees at Troy Towers that he does not like African Americans and would like Troy Towers—even the entire country—to be a fully white community further bolsters the evidence of race discrimination revealed by the testing.

62. Upon information and belief, Mr. Stitt consistently refers to African Americans as "animals" and requires certain guards to warn him of the race of prospective tenants before they arrive at the leasing office. Every tester in the above sample set was required to stop at the guardhouse before heading to the leasing office.

63. Furthermore, Mr. Stitt is very clear to the employees that he trusts that he does not want African American people living at Troy Towers, and brags that he keeps just the right number there so he does not get caught. He has also said that he will only accept people of color to live in Troy Towers if they are so affluent that he could not turn them down.

64. Reviews on Google written by tenants from Troy Towers also indicate that Mr. Stitt makes arbitrary rules for all tenants, and that he is vindictive and vengeful. One of these reviews even plainly calls Mr. Stitt a "racist" and says that he "refuses to rent to people with no rhyme or reason." [Ex. B.].

65. Along with other post-trial relief, Plaintiffs request a preliminary and permanent injunction to enjoin Defendants from engaging in housing discrimination on the basis of race. If the Court does not enjoin Troy Towers and its management from engaging in this unlawful conduct,

11

Plaintiffs and the entire community will suffer the irreparable harm of discrimination. There is no adequate remedy at law because the nature of discrimination creates continuing and irreversible harm. Next, the public interest favors granting a preliminary injunction because housing discrimination on the basis of race decidedly negatively affects the community as a whole as evidenced by its illegality.

66. The balance of hardships weighs strongly in favor of Plaintiffs. There will be significant and irreversible harm to Plaintiffs and the community if Defendants do not stop their unlawful conduct. Conversely, asking Defendants to stop engaging in racial housing discrimination places little burden on them except requiring them simply to comply with federal law.

67. Finally, Plaintiffs are likely to succeed on the merits of this case because they can prove that Defendants engaged and continue to engage in housing discrimination on the basis of race in violation of various sections of the Fair Housing Act.

## CAUSES OF ACTION

### COUNT I:

### Refusing to Negotiate the Rental of Apartments Because of Race

### VIOLATION OF THE FAIR HOUSING ACT – 42 U.S.C. § 3604(a)

68. Paragraphs 1 through 67 are hereby realleged and reasserted as if fully rewritten herein.

69. Defendants Ayson Realty, Troy Towers have injured Plaintiffs Fair Housing Council, Gordon Drewery, Niyah Atwell, and Michael Otuwurunne in violation of the federal Fair Housing Act by committing the following housing practices indicative of disparate treatment:

   a. Discriminating against Plaintiffs by making dwellings unavailable or denying the availability of dwellings because of Plaintiffs' race in violation of 42 U.S.C. § 3604(a).

12

70.  Plaintiffs are aggrieved persons as defined in 42 U.S.C. § 3602(i), have been injured by the Defendants' discriminatory conduct, and have suffered damages as a result.

71. The Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

72. Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT II:

### VIOLATION OF THE FAIR HOUSING ACT – 42 U.S.C. § 3604(b)

73. Paragraphs 1 through 72 are hereby realleged and reasserted as if fully rewritten herein.

74. Defendants Ayson Realty, Troy Towers have injured Plaintiffs Fair Housing Council, Gordon Drewery, Niyah Atwell, and Michael Otuwurunne in violation of the federal Fair Housing Act by committing the following housing practices indicative of disparate treatment:

   a. Discriminating against Plaintiffs in the terms, conditions, or privileges of renting a dwelling because of Plaintiff's race in violation of 42 U.S.C. § 3604(b).

75. Plaintiffs are aggrieved persons as defined in 42 U.S.C. § 3602(i), have been injured by the Defendants' discriminatory conduct, and have suffered damages as a result.

76. The Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

77. Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT III:

### VIOLATION OF THE FAIR HOUSING ACT – 42 U.S.C. § 3604(d)

13

78. Paragraphs 1 through 77 are hereby realleged and reasserted as if fully rewritten herein.

79. Defendants Ayson Realty, Troy Towers have injured plaintiffs Fair Housing Council, Gordon Drewery, Niyah Atwell, and Michael Otuwurunne in violation of the federal Fair Housing Act by committing the following housing practices indicative of disparate treatment:

    a. Discriminating against Plaintiffs by representing to them, because of their race, that housing was unavailable for inspection, sale, or rental, when such dwelling was in fact available in violation of 42 U.S.C. § 3604(d).

80. Plaintiffs are aggrieved persons as defined in 42 U.S.C. § 3602(i), have been injured by the Defendants' discriminatory conduct, and have suffered damages as a result.

81. The Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

82. Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT IV:

## AYSON VICARIOUS LIABILITY FOR ITS EMPLOYEES' HOUSING DISCRIMINATION

83. Paragraphs 1 through 82 are hereby realleged and reasserted as if fully rewritten herein.

84. Ayson Realty owns, operates, and employs the staff at Troy Towers.

85. The employees at Troy Towers carrying out the discrimination are agents of Ayson Realty, which is their principal.

86. The duty of a property owner not to discriminate is non-delegable, thus, a property owner is liable for the acts of its agents even if they instructed those agents not to discriminate.

14

87. Accordingly, Ayson Realty is responsible for the discriminatory acts carried out by its agents.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court grant judgment against Defendants Ayson Realty,

Troy Towers for relief that:

88. Awards actual compensatory and punitive damages;

89. Declares that Defendants Ayson Realty and Troy Towers' actions complained of herein have violated the applicable provisions of the federal Fair Housing Act;

90. Enters a preliminary and permanent injunction against Defendants Ayson Realty and Troy Towers to enjoin all unlawful acts and practices complained about herein;

91. Requires Defendants Ayson Realty and Troy Towers to take appropriate affirmative action to ensure that the activities complained of above are not engaged in again;

92. Awards reasonable attorneys' fees and costs; and

93. Awards all such other relief as the court deems just and proper.

/s/ Linda E. Fisher_____
SETON HALL LAW SCHOOL
CENTER FOR SOCIAL JUSTICE
Linda E. Fisher, Esq. (LF5646)
Mark Linscott, L. Civ. R. 101.1(h)
Kristen Coletta, L. Civ. R. 101.1(h)
833 McCarter Highway
Newark, NJ 07102
Phone (973) 642-8700
Fax (973) 642-5939
Attorneys for Plaintiff

15

SETON HALL LAW SCHOOL
CENTER FOR SOCIAL JUSTICE
Linda E. Fisher, Esq. (LF5646)
Mark Linscott, L. Civ. R. 101.1(h)
Kristen Coletta, L. Civ. R. 101.1(h)
833 McCarter Highway
Newark, NJ 07102
Phone (973) 642-8700
Fax (973) 642-5939
Linda.fisher@shu.edu
Attorney for Plaintiff

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **FAIR HOUSING COUNCIL OF NORTHERN NEW JERSEY, GORDON DREWERY, NIYAH ATWELL, MICHAEL OTUWURUNNE,**<br><br>*Plaintiffs*,<br><br>**v.**<br><br>**TROY TOWERS INC.; AYSON REALTY CORP.,**<br><br>*Defendants*. | **CIVIL ACTION NO. _____**<br><br><br>**CERTIFICATION OF THE FAIR HOUSING COUNCIL OF NORTHERN NEW JERSEY** |

I, Lee Porter, being of lawful age, on behalf of the Fair Housing Council of Northern New Jersey, hereby, certify as follows:

1.  I am the Executive Director of the Fair Housing Council of Northern New Jersey ("Fair Housing Council" or "our organization"). My job entails overseeing all administrative decisions, as well as overseeing the Board of Trustees of the Fair Housing Council. I have been working at the Fair Housing Council for 50 years.

2.  The Fair Housing Council is a private, nonprofit civil rights organization in North New Jersey. Our organization enforces federal and New Jersey housing anti-discrimination laws.

1

3. The Fair Housing Council protects people who experience discrimination by investigating housing discrimination complaints; and if necessary, we work with government agencies and private attorneys to bring actions for housing discrimination to ensure that fair housing laws are vigorously enforced.

4. On July 10, 2017, our organization received an e-mail alleging that the general manager of Troy Towers, later determined to be Frank Stitt ("Mr. Stitt"), regularly engages in housing discrimination on the basis of race. The e-mail stated that Mr. Stitt consistently denies African Americans the opportunity to live at Troy Towers, even if their income is sufficient, because he says that he "hates everything about them."

5. The July 10 e-mail stated that Mr. Stitt requires security guards in the guardhouse to warn him what race a prospective tenant is when the individual arrives on the property. The e-mail reported that when a prospective tenant comes to the guardhouse to check in before an apartment visit, the guard calls the leasing office to let the rental agents know that someone is there for an appointment. It noted that Mr. Stitt will usually call the guardhouse back to ask if the prospective tenant is an "animal," referring to someone of color.

6. Based on the allegations in that e-mail, the Fair Housing Council began investigating possible housing discrimination on the basis of race at the Troy Towers property ("Troy Towers" or "the test site").

7. As our organization commonly does in cases like this, the Fair Housing Council hired testers to act as prospective tenants at the test site. As described in detail in ¶¶ 17-19 of the Verified Complaint, testers represented to the building staff at Troy Towers that they were interested in renting available one bedroom apartments; testers represented themselves to Troy Towers staff with similar, if not the same, qualities and rental preferences. The only significant differentiating trait among the testers was a protected trait – in this case, race.

2

8. Each tester that visited Troy Towers filled out a form provided by our organization that summarizes their experience at the test site. These reports document that each tester called or e-mailed the building staff at Troy Towers to set up an appointment to tour apartments at the test site and then went to those appointments.

9. After reviewing the testers' site visit reports, it became clear that African American testers were consistently treated worse than Caucasian testers. They were shown already taken apartments, different apartments than white testers–even when the tests occurred on the same day–or the building staff was evasive about availability of apartments. Furthermore, as the e-mail we received indicated, each tester was required to stop at the guardhouse before proceeding to the leasing office for his or her tour appointment.

10. In the Fair Housing Council's experience, passive discrimination is the most common form of housing discrimination. Blatant discrimination is very rare. Instead, landlords and their agents make a calculated effort to steer away persons of a protected class from renting in their development by, among other things, lying about rental availability and/or giving evasive answers to reasonable rental questions.

### July 24, 2017 Site Test

11. The events described in ¶¶ 12-17 below are based on our review of the site visit reports that summarize tester visits on July 24, 2017.

12. As described in ¶¶ 26-35 of the Verified Complaint, Plaintiff Gordon Drewery ("Mr. Drewery") was our first on-site tester, arriving at the test site at 11:00 A.M. on July 24, 2017. Mr. Drewery is an African American male who posed as married and indicated that he and his wife had a combined annual income of $168,000. Mr. Drewery requested to see available one-bedroom apartments

3

13. At his appointment, Anna Lustica ("Ms. Lustica"), a Troy Towers employee who often gives tours, told Mr. Drewery that there was an apartment available for August 1, but she could not show it to him that day. She showed him #1005 and #306A instead, but indicated that these apartments were already taken.

14. The same morning at 11:50 A.M., John Moloughney, a Caucasian tester, arrived at Troy Towers for his tour appointment. Mr. Moloughney is a Caucasian male, posed as married, indicated a combined annual income of $152,000, and requested to see available one-bedroom apartments.

15. Ms. Lustica showed Mr. Moloughney units #805 and #1208, which were two completely different units than the ones she showed to Mr. Drewery. The units were vacant and in the process of being cleaned and painted, and she told Mr. Moloughney that they would be available September 1.

16. Ms. Lustica indicated to Mr. Moloughney that the apartments shown on July 24, 2017 would still be available more than an entire month in the future; Ms. Lustica made no such indication to Mr. Drewery, and only showed him apartments that had already been taken.

17. Mr. Moloughney called Ms. Lustica back on July 27, 2017 to see if the two units he saw – #805 and #1208 – were still available and she told him that they were. Mr. Drewery called Ms. Lustica back on July 28, 2017, and Ms. Lustica told him that #1005 was still unavailable, but she had a similar one on the 10th floor. Ms. Lustica did not give Mr. Drewery any information about available units #805 or #1208 – the units that she told Mr. Moloughney were still available. Ms Lustica also did not indicate to Mr. Drewery that there were units that would be available until September 1st as she previously indicated to Mr. Moloughney.

4

**July 31, 2017 Site Test**

18. The events described in ¶¶ 19-27 below are based on our review of the site visit reports that summarize tester visits on July 31, 2017.

19. As described in ¶¶ 36-40 of the Verified Complaint, Mary Martin ("Ms. Martin") and Ralph Menendez ("Mr. Menendez") are Caucasian testers who posed as married, and visited the test site at 2:00 P.M. on July 31, 2017.  The couple requested to see available one-bedroom apartments and indicated a preferred move-in date of August 1, 2017.

20. Mr. Stitt showed them units #101 and #1305, and told them that these units were vacant and would be available on August 1 and August 15, respectively.

21. While both Plaintiff Mr. Drewery (an African American Tester) and Ms. Martin and Mr. Menendez (both Caucasian Testers) gave the same move-in date of August 1 and all requested one-bedrooms, Mr. Drewery was not shown either of these vacant apartments. Instead, he was shown taken apartments and told that there were no vacant apartments he could see at that time.  These tests were conducted only one week apart.

22. As described in ¶¶ 41-44, Plaintiff Niyah Atwell, an African American tester, arrived at the test site shortly after Ms. Martin and Mr. Menendez at 3:00 P.M. on July 31, 2017.  Ms. Atwell met with Mr. Stitt and requested that he show her available one-bedroom apartments for a tentative move-in date of August 15, 2017.

23.  During the duration of Ms. Atwell's visit, she asked Mr. Stitt for his name multiple times and he refused to tell her.

24. Mr. Stitt also informed Ms. Atwell that Troy Towers rented apartments on a first come first served basis and stressed this many times. He told her that a potential tenant should remit the required security deposit and credit check at the earliest possible opportunity, or risk losing an available apartment to a more motivated potential tenant. Mr. Stitt did not

5

communicate this information to any Caucasian Testers who visited Troy Towers on July 31.

25. As described in ¶¶ 45-47, Nicole Pantiliano is a Caucasian female who posed as married, and visited the test site shortly after Ms. Atwell.  She indicated a combined annual income of $152,000.

26. Ms. Pantiliano explained to our agents that she arrived at the leasing office as Ms. Atwell was finishing up her meeting with Mr. Stitt.  Ms. Pantiliano overheard Mr. Stitt and Ms. Atwell's conversation.   Mr. Stitt seemed to be rushing Ms. Atwell out and telling her "whatever she wanted to hear" to get her to leave.

27. Mr. Stitt showed Ms. Pantiliano units #101 and #1305 and told her both would definitely be available for August 15, 2017.  Units #101 and #1305 were the same vacant units that were shown to Caucasian testers Ms. Martin and Mr. Menendez, but were withheld from African American tester Mr. Drewery one week previously.

### August 3, 2017 Site Test

28. The events described in ¶¶ 29-40 below are based on our review of the site visit reports that summarize tester visits on August 3, 2017.

29. The August 3, 2017 site test is the most egregious example of discrimination in this case.

30. Sonia Tross is an African American female who posed as married, and indicated a combined annual income of $168,000.  She arrived at the test site at 10:33 A.M. on August 3, 2017 and met with Ms. Lustica.

31. Ms. Tross requested to see available one-bedroom apartments for a tentative move in date of September 1, 2017.

32. Ms. Tross was shown a tenth floor apartment that had already been rented and was told that there were no available apartments.

6

33. Jayne Ace-Bosgra is a Caucasian female who posed as married, and indicated a combined annual income of $102,000. She arrived at the test site shortly after Ms. Tross, at 11:50 A.M. on August 3, 2017. She told Ms. Lustica that she was looking to move in sometime in August or towards the end of the month.

34. Ms. Lustica showed Ms. Ace-Bosgra a taken tenth floor apartment, presumably the same apartment she showed Ms. Tross. Ms. Lustica then brought Ms. Ace-Bosgra to a vacant and currently available first floor apartment. The door was locked, but Ms. Lustica opened it and let her see the apartment.

35. Plaintiff Ms. Atwell then returned to the test site with another African American tester, Plaintiff Michael Otuwurunne; Ms. Atwell and Mr. Otuwurunne posed as a married couple and indicated a combined annual income of $172,000. The couple came to the test site together and arrived at 2:30 P.M. on August 3, 2017.

36. Ms. Atwell previously visited the test site and met with Mr. Stitt during a July 31, 2017 test discussed above. She was now bringing her husband to see apartments.

37. Ms. Atwell explained to our agents that on August 2, 2017, the day before this site visit, she called Ms. Lustica to tell her that she already came for a visit, but wanted to come in with her husband. Ms. Lustica told her that Mr. Stitt did not mention Ms. Atwell's previous visit, but said that there were three one-bedroom apartments available for an August 15 move-in date that she could show her when they came in the next day.

38. However, when Plaintiffs Atwell and Otuwurunne went to Troy Towers the next day, Ms. Lustica told them that nothing would be available by August 15. She instead showed them a previously-rented tenth floor apartment, presumably the same apartment she showed Ms. Ace-Bosgra and Ms. Tross. Ms. Lustica then brought Ms. Atwell and Mr. Otuwurunne to the same first floor apartment that she showed Caucasian Tester Ms. Ace-Bosgra. However,

7

this time, instead of unlocking the door like Ms. Lustica did for Ms. Ace-Bosgra, she told the couple that the door was probably locked because they had just redone the floors. For that reason, she told them she could not show them that apartment.

39. The discrepancy here is clear: just one day prior to the site visit, Ms. Lustica told Plaintiff Atwell over the phone that there were three apartments available; but the next day, when she met the couple in person and saw their skin color, suddenly everything was taken. Ms. Lustica was able to unlock and show the first floor apartment to Caucasian testers, but was unable to do so for African American Testers—even though the tests occurred within a few hours of one another.

40. Ms. Atwell also noted that during her first visit, she saw the first floor apartment and remembered the floors being clean and finished already.

41. As stated in the e-mail, Mr. Stitt consistently makes racist statements in the presence of Troy Towers' employees; and the site tests described above illustrate that these comments manifest in real discrimination on the basis of race at his workplace.

42. A true and correct copy of the e-mail sent to the Fair Housing Council is attached hereto as Exhibit A.

43. I certify that the foregoing statements are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATE: October 31, 2017

_____
Lee Porter, the Fair Housing Council

8

# Exhibit A

**Fair Housing Council**

| | |
|---|---|
| **From:** | nobody@server.mailers.com |
| **Sent:** | Monday, July 10, 2017 3:18 AM |
| **To:** | info@fairhousingnj.org |
| **Subject:** | Contact Us |

Below is the result of your feedback form.  It was submitted by () on Monday, July 10, 2017 at 03:18:29

------------------------------------------------------------------------

Name: ██████████

Phone: ████████

Email: ████████████████

Email_Confirm: ████████████

Reason: Discrimination/Fair Housing Issue

Comments: Hello. My name is ████████████████████████████████████ ██████████ The general manager of the property is in charge of handling renting and he is responsible for large amounts of discrimination on a daily basis. He regularly refers to African Americans as "animals" and has on many occasions told me outright he will not rent to them even if their income is sufficient because he "hates everything about them" these are his exact words. When prospective renters arrive for an appointment to look at an apartment I have to stop them at the gate and call the office to confirm. Often times after I've sent the client in the direction of the office the manager will call me back and ask "is it an animal" and I respond "if by animal you mean what I think you mean yes." To which he responds "oh they don't have a chance". This is the kind of regular misconduct that happens at my job. It is disgusting and appalling and I cannot stay at this job any longer and put up with  the amount of racism on that property. Please, please, let me know if there are any steps that can be taken to catch this racist man and remove him from his position. It is sickening to think that this man uses his power to deny decent people the opportunity to live in a safe secure building in bloomfield. Feel free to contact me any time. I cannot stand for this injustice any longer. Thank you so much for your time and everything you do to prevent discrimination such as this.

------------------------------------------------------------------------

# Exhibit B

# Troy Towers Inc

40 Conger St, Bloomfield, NJ

✏ Write a review

3.0 ★★★☆☆  37 reviews

Sort by: Most helpful ▾

miserable that it makes other people's life miserable to get self affirmation.

👍 5



**molly mcbutters**

1 review

 a month ago - ⚑

Where do I start?! Let's start with Frank...He is one of the most racist people I know. He is a horrible person and deserves nothing. I know he's having an affair with his assistant, and to be honest I don't know who would even look at him with any form attraction, can you say GROSS?! He refuses to rent to people with no rhyme or reason. Also, he's very hard to get a hold of...probably because he's getting busy in a storage closet or something, who knows. Any way, DO NOT rent here. You're better off somewhere else. Stay Golden renters. Molly out.

👍 10

# Troy Towers Inc

40 Conger St, Bloomfield, NJ



3.0 ★★★☆☆ 37 reviews

Sort by: Most helpful ▾



**Dmitry Polonsky**
17 reviews · 5 photos

 ★☆☆☆☆ a month ago - ⚑

Very unhappy with the current management.  And I am reminded of that every time I have to deal with Frank.  Kept meaning to look for another place for over 2 years, (was locked by the 1 year lease before, no time do it now).  It used to be a good place to live before Frank showed up.  Essentially I will move out because I don't want to deal with these "managers" and their upside down values.  I am going to take a week or to ponder if I want to initiate a change in management or simply move out.... Maybe I should do both....   UPDATE, with in a business day of writing this review I have received numerous threats and accusations from Frank.  He accused me of Vandalism, threatened malicious prosecution and eviction.   Given Frank's vindictive nature, I recommend people to not use their real names when leaving negative reviews.

 16